10-5457-00-6

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

PRODUCTS UNLIMITED, INC., a     )
Nebraska corporation     )
    )
              Plaintiff     )         No. 8:03-CV-32
    )
   v.     )         Judge: Thomas D. Thalken
    )
LEXINGTON INSURANCE COMPANY, a     )
Delaware corporation     )
              Defendant     )

## DEFENDANT LEXINGTON INSURANCE COMPANY'S MOTION FOR PARTIAL SUMMARY JUDGMENT

NOW COMES the above named defendant, Lexington Insurance Company, (hereinafter referred to as "Lexington") by and through its attorneys, and moves for Partial Summary Judgment as to *four issues* which are part of Plaintiff's (hereinafter referred to as "Products Unlimited") First Cause of Action, Breach of Contract, pursuant to Fed. R. Civ. P. 56(c), stating as follows:

1.    Lexington issued policy number 4015060 (hereinafter referred to as the "Policy") to Products Unlimited, for coverage on Products Unlimited's business real property, business personal property, and stock at various scheduled locations, including the property located at 913-915 North 20th Street, Omaha, Nebraska, (hereinafter referred to as the "Property") from April 1, 2000 through April 1, 2001.

2.    On or about October 11, 2000, the Property was damaged by fire (hereinafter referred to as the "First Fire").

862050.1

3.      Thereafter, Lexington commenced its investigation and adjustment as to the claimed damage at the Property caused by the First Fire.

4.      On or about October 22, 2000, the Property was again damaged by fire (hereinafter referred to as the "Second Fire").

5.      Thereafter, Lexington continued its investigation and adjustment as to the claimed damage at the Property, which included investigation and adjustment of the damage caused by the Second Fire.

6.      On or about October 31, 2000, Lexington paid Products Unlimited $99,000.00 for claimed damage at the Property.

7.      On or about January 26, 2001, Lexington paid Products Unlimited $500,000.00 for claimed damage at the Property.

8.      On or about February 28, 2001, Lexington paid Products Unlimited $3,301,854.00 for claimed damage at the Property.

9.      To date, Lexington has paid Products Unlimited $3,900,854.00 for claimed damage at the Property.  This amount of money was paid to Products Unlimited within four months of the First and Second Fires.

**I.      Lexington is onlyli able to Products Unlimited for Replacement Cost Coverage specific to and limited by the Policy's plain language.**

10.      The Policy contains a Replacement Cost Coverage Endorsement which requires Products Unlimited to replace the damaged Property with "due diligence and dispatch." Lexington is not liable for replacement cost coverage "unless and until" Products Unlimited replaces the damaged Property with "due diligence and dispatch."  Products Unlimited did not act with due diligence or dispatch in the replacement of items for which it has made claim.

2

862050.1

11.     Additionally, the Policy contains an Ordinance or Law Coverage Endorsement provision which states that Lexington "will not pay for increased construction costs … [u]ntil the property is actually repaired or replaced at the same premises or elsewhere; and … [u]nless the repairs or replacements are made as soon as reasonably possible after the loss or damage, not to exceed 2 years."  Lexington is not liable to Products Unlimited for any replacement cost charges it incurred after October 22, 2002.

12.     Lexington is only liable for replacement cost coverage on the Property that Products Unlimited *actually* replaced.  Lexington maintains that Products Unlimited did not actually replace at least one item, a spray bonding production line, (hereinafter referred to as "Line #2") for which Products Unlimited has made claim under the Policy in the amount of $1,315,500.00.  Lexington contends that Products Unlimited's intra-company transfer of Line #2 does not constitute actual "replacement" under the Policy.

**II.     Lexington is only liable to Products Unlimited for the stated value of its building as listed in the Policy pursuant to Nebraska's valued policy statute, Nebraska Revised Statute 44-501.02.**

13.     Nebraska's valued policy statute applies only to real property.  In this case, Nebraska's valued policy statute applies to the valuation of the *building portion* of the Property owned by Products Unlimited, and insured under the Policy.

14.     Nebraska's valued policy statute states that when insured property [the building] is "wholly destroyed without criminal fault on the part of the insured … the amount of the insurance written in such policy shall be taken conclusively to be the true value of the property insured and the true amount of loss and measure of damages."  Neb. Rev. Stat. 44-501.02.  Under Nebraska's valued policy statute, when an insured building is wholly destroyed, the insured party receives the value of the building as listed in the insurance policy; in this case, the

3

862050.1

full listed value of the building at the loss site is $1,098,365.00, as stated in the Policy.

Lexington has already paid this sum to Products Unlimited in full, and therefore, owes it nothing

more under Nebraska's valued policy statute for the building's damage.

**III.    Lexington is liable to Products Unlimited under the Policy for Products Unlimited's incurred extra expenses that "exceed the normal operating expenses," subject to the Policy's $25,000.00 sublimit for extra expense costs.**

15.    Under the Policy, extra expenses are "necessary expenses … incur[red] during the

'period of restoration' that you [Products Unlimited] would not have incurred if there had been

no direct physical loss or damage to property …"  Lexington acknowledges that the Policy

provides coverage for extra expenses; however, the Policy only responds to expenses which

"exceed the normal operating expenses," and are "actually incurred" byProducts Unlimited ,

subject to the Policy's $25,000.00 sublimit.  Products Unlimited has made claim for expenses

beyond those which it has actually incurred, and has also claimed as extra expense normal costs

which would have been incurred even in the absence of a fire.  The Policy does not respond to

these claimed expenses.

**IV.    Lexington is not liable to Products Unlimited for any lost labor costs and/or overhead costs consisting of payroll taxes and variable fringe, fixed fringe benefits and manufacturing plant operating expenses; the Policy does not provide coverage of this nature.**

16.    Products Unlimited has submitted as part of its claim, lost labor costs, overhead

costs consisting of payroll taxes and variable fringe benefits, fixed fringe benefits, and

manufacturing plant operating expenses.  Fixed fringe benefits and manufacturing plant

operating expenses would be compensable under typical business interruption coverage.  These

costsare not payable as part of  the Property damage replacement cost coverage, or extra expense

862050.1

coverage.  Further, Lexington is not liable to Products Unlimited for such expenses because Products Unlimited did not purchase business interruption coverage from Lexington.

17.     There is no genuine issue of material fact on any of the four aforementioned issues.  The Policy's plain and unequivocal language, as well as the language of Nebraska's valued policy statute, is ripe for this Court's consideration of Lexington's Motion for Partial Summary Judgment.  This Court recognizes that in accordance with the Eighth Circuit, "primarily legal issues and particularly questions of contract interpretation are issues amenable to summary disposition." *Tim O'Neill Chevrolet, Inc. v. Pinkerton's Inc.,* No. 8:00CV41, 2002 WL 205676, *1 (D.Neb. Feb. 11, 2002).

WHEREFORE, pursuant to Fed. R. Civ. P. 56(c), and the facts and arguments set forth in the attached Memorandum of Law in Support, Lexington prays this Honorable Court enter a Partial Summary Judgment in Lexington's favor and against Products Unlimited, all as prayed herein.

Additionally, Lexington respectfully requests Oral Argument pursuant to NELR 7.1(e), insofar as the Court believes such argument will be useful to the resolution of the issues addressed.

Respectfully submitted,


/s/ John F. Brennan

JOHN F. BRENNAN

MINDY M. MEDLEY

CLAUSEN MILLER, P.C.

JOHN F. BRENNAN

5

862050.1

MINDY M. MEDLEY

CLAUSEN MILLER, P.C.

Firm I.D. No. 90181

Chicago, IL 60603-1098

312.855.1010 (phone)

312.606.7777 (fax)

Attorneys for Lexington Insurance Company


DAVID L. WELCH

GAINES, PANSING & HOGAN, L.L.P.

200 Regency One Building

10050 Regency Circle

Omaha, NE 68114

402.392.3517 (phone)

402.397.4853 (fax)

Attorneys for Lexington Insurance Company

6

862050.1

10-5457-00-6

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEBRASKA

PRODUCTS UNLIMITED, INC., a )
Nebraska corporation )
          )
                   Plaintiff )       No. 8:03-CV-32
          )
      v. )       Judge: Thomas D. Thalken
          )
LEXINGTON INSURANCE COMPANY, a )
Delaware corporation )
                   Defendant )

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT LEXINGTON INSURANCE COMPANY'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Defendant Lexington Insurance Company's (hereinafter referred to as "Lexington") relationship with Plaintiff Products Unlimited, Inc. (hereinafter referred to as "Products Unlimited") is dictated by the language contained in Lexington insurance policy number 4015060 (hereinafter referred to as the "Policy." A full and complete copy of the Policy is attached herein as Exhibit O). The Policy's plain and unequivocal language determines what Lexington must provide to Products Unlimited in case of loss or damage to that which is covered under the Policy. "The parties to an insurance contract may contract for any lawful coverage, and an insurer may limit its obligation under the contract not inconsistent with public policy or statute." *American Family Insurance Group v. Hemenway*, 254 Neb. 134, 140-41, 575 N.W.2d 143 (1998).[1]

The Policy provides all risk insurance coverage at fifteen locations in six different states. Products Unlimited is the named insured under the Policy. The location primarily at issue herein is

---

[1]  Lexington maintains that Nebraska State law applies to the present litigation. Under Nebraska law, "the state with the most significant relationship to the transaction and occurrence and to the parties is applicable." *Tim O'Neill Chevrolet*, *Inc. v. Pinkerton's Inc.*, No. 8:00CV41, 2002 WL 205676 at *2 (D.Neb. Feb. 11, 2002). In this case, a Nebraska corporation purchased insurance for, *inter alia*, the Property which is located in Nebraska; Nebraska has the most "significant relationship" to the issues at hand. Where Nebraska law is available, Lexington will apply Nebraska law. Where Nebraska law is silent, other jurisdictions will be considered.

862050.1

located at 913-915 North 20th Street, Omaha, Nebraska (hereinafter referred to as the "Property").

On or about October 11, 2000 and then again on October 22, 2000, the Property -- consisting of the

building and its contents -- was damaged by fire.  The building portion of the Property was totally

destroyed.  Lexington has paid Products Unlimited nearly $4 million dollars to date.  Products

Unlimited, however, contends that Lexington still owes it an additional $2,279,976.35.

At issue in this Motion for Partial Summary Judgment is *not* the *amount* of damages that

Lexington still, allegedly, owes to Products Unlimited under the Policy, but rather whether the

Policy responds at all to the nature of the additional claims Products Unlimited makes.  Lexington

has fully complied with the Policy's provisions and Nebraska's valued policy statute.

The Policy's plain language and Nebraska's valued policy statute places clear limits, as a

matter of law, on Products Unlimited's claimed additional damages.  A genuine issue of material

fact is markedly absent in the interpretation of applicable Policy provisions and Nebraska's

codified law.  Therefore, Lexington now seeks Partial Summary Judgment herein on four issues

which are part and parcel of Products Unlimited's First Cause of Action, Breach of Contract,

pursuant to Fed. R. Civ. P. 56(c).  Pursuant to NELR 56.1(a), Lexington will present the undisputed

material facts specific to each issue within the presentation of the following Argument.

**ARGUMENT**

This Court knows well the standard to apply when considering whether summary

judgment is appropriate under Fed. R. Civ. P. 56(c):

> Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, the
> court grants summary judgment if the pleadings, depositions,
> answers to interrogatories, and admissions on file, together with
> the affidavits, if any, show that there is no genuine issue as to any
> material fact and that the moving party is entitled to judgment as a
> matter of law.  Fed. R. Civ. P. 56(c).  The court's function at the
> summary judgment stage is not to weigh the evidence and
> determine the truth of the matter; rather, the court must determine
> whether a genuine issue exists for trial. … The Eighth Circuit has

8

862050.1

> recognized that primarily legal issues and particularly questions of contract interpretation are issues amenable to summary disposition. … If the moving party meets the initial burden of establishing the nonexistence of a genuine issue, then the burden shifts to the opposing party to produce evidence of the existence of a genuine issue for trial. … The nonmoving party may not rest upon mere allegations or denials, but must set forth specific facts showing that there is a genuine issue for trial. *Tim O'Neill Chevrolet, Inc. v. Pinkerton's, Inc.,* No. 8:00CV41, 2002 WL 205676, *1-*2 (D.Neb. Feb. 11, 2002).

At issue herein are four matters which require this Court to interpret three Policy provisions and Nebraska's valued policy statute, purely "legal issues and … questions of contract interpretation." *Id.* There is no genuine issue of material fact on any issue presented herein. The Court must simply determine whether Lexington has complied with the relevant Policy provisions and Nebraska's valued policy statute. Lexington maintains that it has fully complied with each; therefore, Products Unlimited's claimed remaining damages should be limited in accordance with the Policy and Nebraska's valued policy statute as a matter of law.

Inherent in every issue discussed herein is that the Court must interpret language contained in an insurance policy, and language found in a statute. "The language of an insurance policy should be read to avoid ambiguities, if possible, and the language should not be tortured to create them." *Hemenway*, 254 Neb. at 141. "In interpreting an insurance contract, the court construes the policy as any other contract … Where the terms of such contract are clear, they are to be accorded their plain and ordinary meaning." *Eledge v. Farmers Mutual Home Insurance Co. of Hooper, Nebraska,* 6 Neb.App. 140, 148, 571 N.W.2d 105 (1997). Similarly, "[i]n the absence of anything to the contrary, statutory language is to be given its plain and ordinary meaning; an appellate court will not resort to interpretation to ascertain the meaning of statutory words which are plain, direct, and unambiguous." *Big Crow v. City of Rushville*, 266 Neb. 750, 754, 669 N.W.2d 63 (Sept. 26, 2003). Lexington maintains,and Products Unlimited has not

9

862050.1

asserted otherwise, that neither the Policy language at issue nor Nebraska's valued policy statute is ambiguous.  Therefore, this Court should adhere to the language's plain meaning in both.

### I. Lexington is only liable to Products Unlimited for Replacement Cost Coverage specific to and limited by the Policy's plain language.

The Policy contains two provisions specific to Products Unlimited's ability to receive replacement cost coverage.  Under the Replacement Cost Endorsement, Lexington is not liable to Products Unlimited for replacement cost coverage unless and until the property for which it claims is actually repaired or replaced by Products Unlimited with due diligence and dispatch.  (A true and correct copy of the Policy's Replacement Cost Endorsement is attached as Exhibit A).  Under the Policy's Ordinance or Law Coverage Endorsement which modifies the Policy's Building and Personal Property Coverage Form, Lexington is not liable to Products Unlimited for its claimed damages unless and until Products Unlimited actually repairs or replaces the property for which it claims, as soon as reasonably possible after the loss, not to exceed two years.[2]  (A true and correct copy of the Policy's Ordinance or Law provision is attached as Exhibit B).  Lexington retained Certified Public Accountant, William J. Bradshaw, to analyze Products Unlimited's claim.  Mr. Bradshaw's affidavit and supporting spreadsheets (Exhibits 1 and 2 to his affidavit) are attached herein as Exhibit C.

Finally, inherent in both Policy provisions is that Products Unlimited must actually *replace* the property insured under the Policy to receive replacement cost coverage.  Products Unlimited is part of interrelated businesses owned and operated by the same parties that

---

[2]   Although Lexington contends that two years is likely beyond that which is considered within the parameters of "due diligence and dispatch," Nebraska is silent on this specific issue.  The Eighth Circuit, however, considering an appeal from the United States District Court for the District of Nebraska, affirmed a decision that five months between the damage-causing fire and the insured's receipt of a repair permit was *not* beyond the replacement cost endorsement requiring the insured's due diligence and dispatch.  *Central National Insurance Co. of Omaha v. Devonshire Coverage Corp.,* 565 F.2d 490, 496 (8th Cir. 1977).

862050.1

manufacture bonded fibers, pillows, hobby crafts, and sleep products. Products Unlimited has locations in Wisconsin, Nevada, Iowa, Kentucky, and Nebraska. Each location associated with Products Unlimited is insured under the Policy. At issue herein is the transfer of Line #2 from the Kentucky location to Products Unlimited in Nebraska. Lexington maintains that Products Unlimited's decision to transfer Line #2 from a subsidiary of Products Unlimited, a business located at a place *also insured under the Policy*, does not constitute actual replacement as required by the Policy.[3] Therefore, Products Unlimited is only entitled to recover the actual cash value of Line #2.

### A.    The intra-company transfer of Line #2 does not constitute replacement under the Policy.

Products Unlimited submitted as part of its claim an invoice in the amount of $1,315,500.00 for a "used spray bonding production line" referred to herein as Line #2. (A true and correct copy of invoice indicating same is attached as Exhibit D). This invoice relates to the transfer of Line #2 from Bonded Fibers Southeast, Inc. (hereinafter referred to as "Southeast") located at One Washington Way, Franklin, Kentucky, to Products Unlimited in Nebraska. Both Products Unlimited and Southeast are insured locations under the Policy.

As indicated in the deposition of Mr. Gary Pospisal, Vice President of Engineering at Products Unlimited, Southeast is a corporation "related" to Products Unlimited. (*See*, deposition of Mr. Gary Pospisal, p. 103, attached as Exhibit E). Pospisal stated that Southeast is within the larger

---

[3]    The law requiring actual replacement of property before an insured is entitled to replacement cost is clear. *See, e.g., Ghoman v. New Hampshire Insurance Co.,* 159 F.Supp.2d 928, 932 (N.D.Tex. 2001), "[o]bviously, an insured cannot recover repair or replacement costs unless and until he actually repairs or replaces the insured structure."; *James B. Lansing Sound, Inc. v. National Union Fire Insurance Co. of Pittsburgh*, 801 F.2d 1560, 1565 (9th Cir. 1986), when an insurer writes a policy giving the insurer the option to repair or replace, "[a]n insurer loses any right to exercise an election to limit its ability to replacement costs if it has neither replaced the property nor given timely notification of its intention to do so."; *State Farm Fire & Casualty Co., et al. v. Patrick,* 647 So.2d 983 (Fla. Dist. Ct. App. 1994), "[c]ourts have almost uniformly held that an insurance company's liability for replacement cost does not arise until the repair or replacement has been completed."

corporate umbrella of Products Unlimited.  (Exhibit E, Pospisal deposition, p. 113).  Products

Unlimited President Scott Beier characterized Southeast as a sister corporation of Products

Unlimited.  (*See,* Exhibit F, Beier deposition, p. 63).  Lexington contends herein, however, in

accordance with the well-settled law of Nebraska, that Southeast is not an arm's length corporate

vendor[4] "related" to Products Unlimited, but is actually a subsidiary or division of Products

Unlimited.  Shipment of Line #2 from one Products Unlimited location to another does not

constitute "replacement."  No new value was added under the Policy for Line #2.  No replacement

took place.

In accordance with Nebraska law,

> '[t]he notion of separate corporate existence of parent and
> subsidiary or affiliated corporations will not be recognized where
> one corporation is so organized and controlled and its business
> conducted in such a manner as to make it merely an agency,
> instrumentality, adjunct, or alter ego of another corporation.  The
> fiction of separate corporate identity of two corporations will not
> be extended to permit one of the corporations to evade its just
> obligations or to promote fraud or illegality or injustice.'  *Graham
> Graphics, Inc. v. Baer Marketing International, Inc.,* 10 Neb.App.
> 382, 387-88, 631 N.W.2d 550 (2001), *quoting, Hayes v. Sanitary
> & Improvement District No. 194*, 196 Neb. 653, 664, 244 N.W.2d
> 505 (1976).

In *Hayes*, the Supreme Court of Nebraska affirmed the lower court's decision holding

that two of the defendants did not constitute "separate corporate entities."  *Hayes*, 196 Neb. at

664.  In rendering its decision, the Supreme Court of Nebraska in *Hayes* placed importance on

the fact that the officers and directors of the two corporations at issue interlocked, "even though

the corporations maintained separate books and separate tax returns."  *Graham Graphics*, 10

Neb.App. at 387, *citing, Hayes*, 196 Neb. at 663.  While ignoring separate corporate status is not

---

[4]  Products Unlimited would have Lexington believe that Southeast is a vendor of Products Unlimited.
(*See*, e.g., a copy of an invoice from Southeast to Products Unlimited, submitted as part of Products Unlimited's
claim submission to Lexington, in the amount of $1,315,500.00 for Line #2, attached as Exhibit D).

12

862050.1

necessary to Lexington's position, the facts here show that Products Unlimited and Southeast were not dealing at arm's length.  In essence, Products Unlimited expended no new value to acquire, to purportedly "replace," Line #2.

Lexington maintains that in accordance with Nebraska law, this Court should find that the transfer of Line #2 from one Products Unlimited entity to another does not constitute replacement under the Policy.[5]  The officers and directors of Products Unlimited, Southeast, and other Products Unlimited entities are so "interlocked" that Products Unlimited and Southeast do not constitute separate corporate entities, and should not be treated as such by this Court.

Indeed, Mr. Michael B. Beier, registered agent of Southeast, is also President of Bonded Fibers & Quilting, Inc., (hereinafter referred to as "BF & Q") located in Iowa.  (*See*, corporate disclosure statements, taken from Secretary of State websites on November 3, 2003, attached herein as Exhibit G).  John K. Beier, Treasurer of BF & Q, is also President and Director of Products Unlimited, as well as President of Products Unlimited, Inc., incorporated in Nevada (hereinafter referred to as "Nevada").  (*See*, Exhibit G).  Finally, Debra Young is secretary/treasurer at BF & Q, Products Unlimited, and Nevada.  (*See*, Exhibit G).  Additionally, both John K. Beier and Debra Young were disclosed by Products Unlimited as individuals who are likely to have discoverable information in this proceeding.  (A true and correct copy of relevant portion of Products Unlimited's Initial Disclosures, pp. 1-3, are attached as Exhibit H).  Finally, and perhaps most importantly, the Policy *provided coverage for Southeast.*  Indeed, the Policy's statement of values lists Southeast, location number thirteen in Franklin, Kentucky, as a

---

[5]  By way of analogy, Lexington presents a situation wherein a husband allows his wife to use his car after hers is totaled.  If this couple had a replacement cost provision in their automobile insurance policy which required the wife to replace her car before she could receive full coverage, her use of her husband's car would clearly not suffice.  An analogous situation is present herein.

13

covered property under the Policy.  (A true and correct copy of the Policy's Statement of Values is attached as Exhibit I).

Under Nebraska law, Products Unlimited and Southeast do not constitute separate corporate entities, and should not be treated as such by this Court.  Products Unlimited would like Lexington to believe that Southeast constitutes a vendor of machinery for Products Unlimited, in other words, an independent corporation which sold Line #2 to it.  This Court, however, should limit, as a matter of law, Products Unlimited's ability to recover damages for Line #2.[6]

The Policy specifically states that "[u]ntil the property is actually … replaced[,]" Lexington is not liable.  Products Unlimited did not actually replace Line #2, it simply chose to use property it already owned, *and which the Policy already insured*, by transferring it to another location so that it could continue its operations.  This is not an example of replacement under the Policy.  "The fiction of separate corporate identity of two corporations will not be extended to permit one of the corporations to evade its just obligations or to promote … injustice." *Graham Graphics*, 10 Neb.App. at 388.  This Court should not allow Products Unlimited to claim over $1.3 million in replacement cost damages for Line #2 which was not replaced; doing so would promote patent injustice.

---

[6] In *Omaha Paper Stock Co. v. Harbor Ins. Co.*, 596 F.2d 283 (8th Cir. 1979), the insured's business interruption coverage required it to use any buildings, surplus machinery or duplicate parts, stock and equipment to expedite the continuance or resumption of business. *Id.* at 287.  The policy allowed for a stipulated per diem payment to be made for those days when work at the loss site was prevented by the fire.  The court held that the duration of the business interruption would be measured at the loss site alone, and not by the higher use of other equipment at a different site owned by the insured.  The court said that the surplus production at the second site ". . . did not affect, nor would it help, the resumption or continuance of business at the . . . [loss site][and so], such surplus production was not taken into consideration in determining whether there had been total or partial suspension of the business." *Id.* at 291.  Implicit in the court's holding is the concept that use by an insured of alternative means of production already at its disposal does not constitute replacement.

14

862050.1

Lexington respectfully requests that this Court enter Partial Summary Judgment in favor of Lexington and against Products Unlimited on the issues presented by the Policy's replacement cost coverage provisions. The Policy provisions and facts presented herein can not be disputed.

**B.    Lexington is not liable to Products Unlimited for costs it incurred after October 22, 2002, two years after the Second Fire, as well as those costs now planned to be incurred.**

Products Unlimited has submitted as part of its claim to Lexington damages in the amount of $96,718.71 that were incurred *after* the two year requirement explicitly contained in the Policy. (*See*, affidavit of William J. Bradshaw, p. 3, paragraph 7, attached as Exhibit C). Not only did Products Unlimited have sufficient notice of the Policy's two year requirement through the Policy's plain language, but Lexington also notified Products Unlimited on more than one occasion of its intent to adhere to the two year requirement under the Policy in written correspondence.

Furthermore, Products Unlimited had funds necessary to begin the replacement process long ago; it can not argue that Lexington's failure to pay under the Policy hindered its ability to commence replacement. Indeed, Products Unlimited received payments from Lexington in the amount of $99,000 on October 31, 2000, $500,000 on January 26, 2001, and $3,301,854 on February 28, 2001. These three payments total $3,900,854, and were paid within *four months* of the loss. This fact is undisputed. This total sum included a payment of $1,098,365 which represents the full amount of the value of the building listed on the Schedule of Values in the Policy. The remainder of the monies paid to Products Unlimited represent the value of machinery and equipment, raw materials, finished goods and extra expenses. These payments were made at a time when the sums paid by Lexington far exceeded the claim documentation submitted by Products Unlimited.

15

Products Unlimited has had a substantial amount of money, paid by Lexington, for well over two years. Despite Lexington's prompt payments, Products Unlimited has not replaced as of mid-September, 2003, items damaged by the First and Second Fires. Lexington calculated its payments on the assumption that Products Unlimited would replace within the time parameters provided in the Policy. Since replacement did not in fact occur as to all or substantial parts of the alleged damage to business personal property, Lexington may have actually overpaid Products Unlimited by a substantial margin the true measure of loss under the Policy.

Aside from Products Unlimited's receipt of substantial sums, Lexington provided Products Unlimited with sufficient notice of its intent to adhere to the Policy's time limits and requirements. Lexington's claim correspondence clearly illustrates this fact. [7]

---

[7] Products Unlimited was on notice virtually from the inception of the October losses that strict adherence to the Policy conditions would be required as demonstrated by the extensive correspondence incorporated herein.

On February 11, 2002, Products Unlimited was advised by Lexington's retained adjuster that recovery was limited to the actual cash value immediately prior to the loss unless and until the Property is actually repaired or replaced with due diligence and dispatch. In this same correspondence, Products Unlimited was also advised of the application of the Ordinance or Law Coverage Form, providing that increased costs of construction are only recoverable if repairs or replacement are made within two years. (*See*, Exhibit B). In that same letter, Lexington reminded Products Unlimited that it had not received a response to its correspondence of January 16, 2001, and asked Products Unlimited to advise of its position and whether it agreed with Lexington that its limit on the building did not exceed anything more than the scheduled value of the building. (*See*, Exhibit K, Letter to Products Unlimited dated February 11, 2002).

On March 4, 2002, Products Unlimited wrote Lexington indicating that it may pursue replacement and/or rebuilding of items and business personal property to alleviate lost productive capacity, and proposed its intention to resort to a number of sister corporations, and wanted to give Lexington the opportunity to address any concerns it may have. On March 18, 2002, Products Unlimited again wrote stating its intention to rebuild lost productive capacity. On March 18, 2002, Lexington's retained adjuster wrote Products Unlimited requesting full details relating to Products Unlimited's proposal. On March 19, 2002, Lexington's counsel requested full details, advising of the replacement cost coverage limit. (True and correct copies of the aforementioned correspondence is attached as Exhibit L.) Lexington did not receive a substantive reply from Products Unlimited in response to its letters of March 18, 2002 and March    19, 2002. Correspondence between the parties continued thereafter.

On January 10, 2003, Lexington again reiterated its concerns relating to Products Unlimited's claim presentation, including, but not limited to: Products Unlimited's attention to the requirements to present a claim; the requirement of due diligence and dispatch in the repair; the resumption of operations; and the ordinance and law coverage time limitation on replacement coverage. (*See*, Exhibit M, Letter to Products Unlimited dated January 10, 2003). Perhaps most importantly, this correspondence highlights Lexington's efforts to remain in contact with Products Unlimited, despite Products Unlimited's failure to respond to correspondence at various times. (*See*, Exhibit M, p. 4).

16

Therefore, as a matter of law, the plain language of the Policy mandates that this Court limit Products Unlimited's recovery in accordance with the plain language of the Policy. A genuine issue of material fact simply does not exist. Replacement is required within two years, whether regarded as the legally outside period for "due diligence" or as part of the integrated reading of the Law and Ordinance Replacement Cost provision. Regardless of how the Policy's requirement is couched, two years is enough.[8]

The Policy requires Products Unlimited to repair or replace damaged property within two years to receive payment of replacement cost from Lexington.[9] Products Unlimited has not complied; therefore, its claimed damages on property repaired or replaced after October 22, 2002 are not recoverable at replacement cost, but *only* at the lesser amount of actual cash value. Additionally, in Products Unlimited's most recent claim submission, it listed as part of its claimed damages, personal property that it *plans* to replace.[10] (*See*, affidavit of William J. Bradshaw, pp. 4-5, attached as Exhibit C).

---

To summarize all correspondence discussed herein, Products Unlimited has had full and sufficient notice of the applicable Policy provisions, and Lexington's intent to adhere to them.

[8] Indeed, some of the world's largest structures have been constructed within such period: Sears Tower - 1973; Petronas Towers  - 1998.

[9] Courts frequently enforce contractual provisions requiring an insured to replace. *See*, *Bailey v. Farmers Union Co-op. Ins. Co.,* 1 Neb.App. 408, 498 N.W.2d 591 (1992); *Bourazak v. North River Ins. Co.*, 379 F.2d 530 (7th Cir. 1967) ( Illinois law); *Machson v. Wausau Underwriters Ins. Co.*, 1986 WL 8179 (Del Super., July 24, 1986); *Paluszek v. Safeco Ins. Co. of America*, 164 Ill.App.3d 511, 517 N.E.2d 565 (1st Dist. 1987); *Athena Restaurant v. Sheffield Ins. Co.*, 681 F.Supp. 561 (N.D.Ill. 1988); *Goldstein v. Fidelity & Guaranty Ins. Underwriters, Inc.*, 86 F.3d 749 (7th Cir. 1996) (Illinois law); *Harrington v. Amica Mut. Ins. Co.*, 223 A.D.2d 222, 645 N.Y.S.2d 221 (1996); *Kastendieck v. Millers Mut. Ins. Co.*, 946 S.W.2d 35 (Mo.App. 1997).

[10] Notwithstanding all of the above arguments, if the equipment has not been replaced in three years, it is unrecoverable. On September 18, 2003, Gary Pospisal, Products Unlimited's engineer, testified that Products Unlimited had not yet completed replacement of Line #1. (*See* Exhibit E, Pospisal deposition, p. 103-04).

17

Mr. Bradshaw's affidavit illustrates this issue with the example of Line #1. (*See*, Exhibit C, p. 4). The actual cash value claim of Products Unlimited for this line is $1,029,000. Products Unlimited indicates it will be seeking the higher measure of loss known as replacement cost in the amount of $1,586,726, even though Line #1 was not replaced within two years of loss. The Policy prohibits recovery at the replacement cost level where Products Unlimited has not replaced within two years. In accordance with the Policy's two year requirement for recovery of repair or replacement cost, obviously costs arising from any *plans* Products Unlimited has to incur such additional expenses are not recoverable under the Policy.[11]

## II.     Lexington is only liable to Products Unlimited for the stated value of its building as listed in the Policy pursuant to Nebraska's valued policy statute, Nebraska Revised Statute 44-501.02.

The stated value of Products Unlimited's building as listed in the Policy is $1,098,365.00.[12]  (*See*, Exhibit I). Lexington has paid Products Unlimited the full amount of the Policy's stated value for the building. (*See*, p. 8 of Lexington's Answer and Affirmative Defenses, previously filed with the Court.)  Products Unlimited, as a matter of law, can not recover any additional funds for the building.

---

[11] The requirement that the insured must replace before being entitled to recover replacement cost value is merely a logical extension of the most fundamental principle of insurance:  a contract of insurance is a contract of indemnity and a person seeking to enforce it must show an interest in the subject matter. *Stansics v. Hartford Fire Ins. Co.*, 83 Neb. 768, 120 N.W. 435 (1909); *Bassett v. Farmers' Merchants' Ins. Co.,* 85 Neb. 85, 122 N.W. 703 (1909).  For example, an insured mortgagee has a right to be indemnified only up to the amount of the mortgage debt outstanding, not the entire value of the premises securing the mortgage. *Pantano v. Maryland Plaza Partnership*, 244 Neb. 499, 507 N.W. 484 (1993).  An insured recovers actual cash value of the loss because the principle of indemnity gives such insured the value of the property lost.  However, to recover the typically higher replacement cost for newly-acquired property, the insured must actually replace that property. *McCorkle v. State Farm Fire Ins. Co.*, 221 Cal.App.3d 610, 270 Cal.Rptr. 492 (1990).  The court held that the replacement cost policy did not require the insurer to pay for a new cement floor in a garage where prior to the loss, the floor was made of wood.  The court noted that the cement floor was not equal in value to the wood floor, and therefore, the insured could not recover more than required to repair or replace with materials of like kind and quality.  Insurance should not put an insured in a better position than he was prior to damage.

[12] Because Nebraska's valued policy statute only applies to real property, namely the building portion of the Property, Lexington only contemplates Products Unlimited's *building* in Argument section Roman numeral II.

18

862050.1

Nebraska's valued policy statute states that

> [w]henever any policy of insurance is written to insure any real property in this state against loss by fire, tornado, windstorm, lightning or explosion and the property is wholly destroyed without criminal fault on the part of the insured or his or her assignee, the amount of the insurance written in such policy shall be taken conclusively to be the true value of the property insured and the true amount of loss and measure of damages. Neb. Rev. Stat. 44-501.02 (2000).

The facts at issue herein present an interesting situation, however, since the building was deemed to be wholly destroyed as a result of the fire which occurred on October 11, 2000, (hereinafter referred to as the "First Fire"), and then further damaged as a result of another fire, which occurred only eleven days later (hereinafter referred to as the "Second Fire"). Lexington now asks this Court to declare that as a matter of law, Products Unlimited is only entitled to recover the building's stated value listed in the Policy as $1,098,365.00, which has already been paid by Lexington. Any recovery greater than the stated value for the building in the Policy would be contrary to Nebraska law, and provide Products Unlimited with a windfall, an amount greater than that which is provided by the Policy, and allowed under Nebraska's valued policy statute.

On January 16, 2001, Lexington's counsel wrote Products Unlimited's counsel advising of the application of Section 44-501, *et seq.*, Nebraska's Revised Statutes, including Section 44-501.02. In this correspondence, Lexington's counsel addressed the application of *Lancashire Ins. Co. v. Bush, et al.*, 16 Neb. 116, 82 N.W. 313 (1900). (*Lancashire* is discussed herein, *infra*). In this regard, Products Unlimited's counsel was alerted to the fact that the reported Statement of Values, Commercial Property Coverage Form, as applicable, provided that the building value was $1,098,365. Further, Products Unlimited's counsel was advised that the current Limit of Liability Endorsement, provided in part that the premium is based upon the Statement of Values on file with

19

862050.1

Lexington, and in the event of loss, liability of Lexington shall be limited to the smallest amount of the total stated value for the property involved as shown on the latest Statement of Values on file with Lexington, less the applicable deductible.  Products Unlimited's input and comments were invited.  Throughout the loss adjustment and to the present day, Products Unlimited has not substantively responded to the correspondence of January 16, 2001, nor has it identified any basis that the Nebraska statute should not be applied to limit its recovery to the building value of $1,098,365.  (*See* Exhibit J, Letter to Products Unlimited dated January 16, 2001).  Subsequent correspondence with Products Unlimited demonstrates that Products Unlimited was at all times on notice of the Policy's relevant terms and conditions on the specific advice of Lexington.[13]

Nebraska's valued policy statute applying to real property has been in effect for well over 100 years.[14]  *See, e.g., Granite State Fire Insurance Co. v. Buckstaff Brothers Manufacturing Co.*, 53 Neb. 123, 73 N.W.544 (1897), *Omaha Fire Insurance Co. v. Sinnott*, 54 Neb. 522, 74 N.W. 955 (1898).  The import of Nebraska's valued policy statute "'is to have the value liquidated in the policy by the parties to the contract and removed from dispute and determination by evidence, agreement or arbitration.'"  *Duda v. American Family Insurance Group,* No. A-01-365, 2002 WL 31108172, *4 (Neb.App. Sept. 24, 2002), *quoting, Heady v. Farmers Mutual Insurance Co.*, 217 Neb. 172, 179, 349 N.W.2d 366 (1984), and *Lancashire Insurance Co. v. Bush*, 60 Neb. 116, 82 N.W. 313, 314 (1900).  When property insured is wholly destroyed, the insured is entitled to the agreed value of the insured property as stated in the insurance policy.  *Duda*, 2002 WL 31108172 at *5.

---

[13] *See* fn.7, *supra.*

[14] The valued policy statute by its terms applies to buildings only, and not to equipment, personal property, or extra expense.  Neb. Rev. Stat. 44-501.02.

20

In *Lancashire Insurance Co. v. Bush*, the Supreme Court of Nebraska considered the amount recoverable for property which was partially damaged by a fire in July, 1894, and then completely destroyed by a second fire approximately two months later.  82 N.W. at 313.  After the initial fire, the insurer paid the insured the amount of the damage caused by the July fire, an amount less than the face value of the property as listed in the policy because the property was not wholly destroyed.  *Id.*  After the second fire, the insurer was responsible *only for* the difference between the payment for partial damage and the face value of the policy.  *Id.* at 314.  The insurer in *Bush* was  *not* liable to its insured for the full amount of the policy.  *Id.*   The Supreme Court of Nebraska held as follows:

> [t]he statute, [Nebraska's valued policy statute] which is to be regarded as part of the contract, fixes conclusively the worth of the building which is the subject of insurance.  If the property is wholly destroyed, its actual value is not to be determined by evidence, agreement, or arbitration.  The damages are liquidated, and the measure of recovery already ascertained.  But, if a partial loss occur, the policy holder is entitled to actual damages only, because the law has not fixed the value of any part of the insured property.  In this case the insurer paid the actual damages resulting from the first fire.  It does not claim to have paid anything more.  When the second fire occurred, and the building was wholly destroyed, the owners were entitled to recover as damages its true value, less the amount previously paid. … *We are not able to see any force in the argument that the statute does not apply because the property was destroyed by two fires instead of one.  Id.* at 313 - 14.  (Emphasis added).

Therefore, in accordance with the plain language of Nebraska's valued policy statute, and the decision of the Supreme Court of Nebraska in *Bush*, Lexington requests that this Court grant Lexington Partial Summary Judgment on this issue, and state that as a matter of law, Lexington

21

862050.1

is liable to Products Unlimited for the Policy's *stated value* of the building. In short, Lexington

paid the full amount scheduled in the Policy ($1,098,365.00) and owes nothing more.[15]

> **III.    Lexington is liable to Products Unlimited under the Policy for Products Unlimited's incurred extra expenses that "exceed the normal operating expenses," subject to the Policy's $25,000.00 sublimit for Extra Expense costs.**

The Policy provides coverage for extra expenses incurred by Products Unlimited subject

to a $25,000.00 sublimit. (A true and correct copy of the Policy's extra expense coverage

provision and relevant sublimit statement is attached herein as Exhibit N).[16] The Policy states

that the "amount of Extra Expense will be determined based on: 1) All expenses that exceed the

normal operating expenses that would have been incurred by 'operations' during the 'period of

restoration' if no direct physical loss or damage had occurred." (*See*, Exhibit N, p. 4-5 of 8).

The Policy defines "operations" as Products Unlimited's "business activities occurring at the

described premises [the Property]." (*See*, Exhibit N, p. 8 of 8). The import of the Policy's extra

expense  provisions is that extra expense costs incurred by Products Unlimited because of

physical damage are covered *provided that* such expenses "*exceed the normal operating

expenses.*"

Mr. Bradshaw's examination and evaluation of Products Unlimited's claim submission

concluded that much of its claimed "extra expenses"  "do not represent above normal costs, but

simply [are] an allocation of normal plant overhead costs." (*See*, affidavit of Mr. Bradshaw,

---

[15]   Nebraska has addressed multiple successive fires, and its valued policy statute for more than 100 years to one result:  there is only recovery for the policy's stated value of the building.  This is why Products Unlimited's counsel has been silent for close to three years on any other result.

[16]   Lexington notes for this Court that although this Policy provision also specifically contemplates business income coverage, business income coverage was not purchased at the Property.  Indeed, the only insured location to have business income coverage is the location listed as #5 on the Policy's Statement of Values, attached herein as Exhibit I).

862050.1

page 3, paragraph 6, Exhibit C).  Lexington fully recognizes that Products Unlimited's costs related to the set up of temporary offices are covered by the Policy's extra expense provision; however, as a matter of law, and in accordance with the plain language of the Policy, the Policy does not provide coverage for Products Unlimited's *normal* operating expenses.  Indeed, Products Unlimited is always responsible for its own overhead costs, unless such costs *exceed* normal operating costs because of damage to the Property.  Case law fully supports this position.

A.    **Products Unlimited's normal operating expenses are not covered by the Policy.**

In *Nassau Gallery, Inc. v. Nationwide Mutual Fire Insurance Co.,* the Superior Court of Delaware considered whether the insured's claimed "extra expenses"[17] were covered under the policy's extra expense provision.  No. Civ.A. 00C-05-034, 2003 WL 21223843 at *1 (Del.Super. April 17, 2003).  The court held that only the costs related to the insured's advertising expenses were covered under the policy's extra expense provision.  *Id.* at *4.  The court stated as follows:

> Extra Expenses are the costs associated with 'continu[ing] as nearly as practicable the normal conduct of the insured's business during the period of restoration following a direct loss by a named peril to buildings or contents used by the insured.' *Travelers Indemnity Co. v. Pollard Friendly Ford Co.,* 512 S.W.2d 375, 377, 379 (Tex.Civ.App. 1974). … Advertising expenses incurred to inform the public of the Gallery's [insured location] post-fire status are valid Extra Expenses … The Gallery used advertisements to inform the public that it remained open for business.  This publicity was related to the normal conduct of business and allowed the Gallery to operate during its restoration period. … (Extra expense coverage deals with the increased costs of doing business after a covered loss.) … The Gallery's advertising expenses, totaling $980.00, must be offset against the Gallery's 1998 advertising expenditures of $300.00.  This creates a compensable difference of $680.00. *Id.* at *2-*4.

_____

[17]  In *Nassau Gallery*, the insured submitted as part of its extra expense claim, expenses for a new security system, garbage removal, and advertising, as well as costs related to the rebuilding of some of the damaged property.  2003 WL 21223843 at *1.

862050.1

In *Thrift Mart, Inc. v. State Farm Fire & Casualty, Co.* the Supreme Court of Nebraska held that the insured's decision to liquidate its warehouse inventory was *not* covered under the policy's business income and extra expense coverage provisions. 251 Neb. 448, 456, 558 N.W.2d 531, (1997), *overruled on other grounds by Horning v. Martel Lift Systems, Inc.*, 258 Neb. 764, 770, 606 N.W.2d 764 (2000). The Supreme Court of Nebraska held and rationalized as follows:

> [t]he policy specifically defines 'operations' as 'the type of business activities occurring at the premises shown in the Declarations,' which in this case is the location at which the fire occurred … Clearly, the liquidation of warehouse inventory which occurred, by Thrift Mart's [the insured] own admission, when the business ceased its operations completely and which does not fit within the policy definitions of 'business income' is not covered under the insurance policy's loss of business income provision. The policy specifically states that this coverage is for expenses arising from disruptions during the continuing operation of the business at a temporary site or during the relocation of the business to a new site if operations cannot continue at the premises where the fire occurred. Thrift Mart liquidated its warehouse after deciding to cease business operations -- any loss sustained because of the circumstances of liquidation not related to continuing business activity is not recoverable under this fire insurance policy. 251 Neb. at 456.

The Supreme Court of Nebraska's opinion in *Thrift Mart* provides guidance that Nebraska recognizes and adheres to an insurance policy's plain language in general, and the plain language of extra expense coverage provisions in particular. This Court should do the same in accordance with the Policy's plain language. Lexington is *only* liable for extra expenses incurred by Products Unlimited that "exceed the normal operating expenses." (*See*, Exhibit N, p. 5 of 8). Any expenses that are simply normal operating expenses, expenses incurred by Products Unlimited because of its regular business operations, are *not* covered by the Policy. Lexington requests that this Court render Partial Summary Judgment on this issue. No genuine issue of

24

862050.1

material fact is present -- the Policy's clear language and Mr. Bradshaw's supporting affidavit indicate this much.

#### IV.    Lexington is not liable to Products Unlimited for any lost labor costs and/or overhead costs consisting of payroll taxes and variable fringe, fixed fringe benefits and manufacturing plant operating expenses; the Policy does not provide coverage of this nature.

Neither the Policy's Replacement Cost Coverage nor the Extra Expense Coverage compensate Products Unlimited for lost labor cost and overhead costs consisting of payroll taxes, variable fringe benefits, fixed fringe benefits and manufacturing operating expenses.  Products Unlimited has brought suit upon a policy of insurance that does not include business interruption coverage for the Property; therefore, such coverage is obviously not available to Products Unlimited.[18]  (*See, e.g.,* correspondence from Lexington's retained insurance adjuster, James L. Terlecki, February 11, 2002, p. 5, attached herein as Exhibit K).  The language of the Policy restricts the extent and nature of the claims that are properly compensable.

#### A.    Products Unlimited can not receive coverage for damages the Policy does not contemplate.

Products Unlimited has submitted as part of its claim to Lexington "internal labor charges for Products Unlimited employees in two components:  base labor of $360,140.60 … and overhead cost of $304,050.50 … for a total of $664,191.10.  … The claimed overhead charges include incremental payroll taxes and fringe benefits, fixed fringe benefits and manufacturing plant operating expenses."  (*See*, affidavit of William J. Bradshaw, p. 2, attached herein as Exhibit C).  Mr. Bradshaw has concluded, after evaluation and analysis of Products Unlimited's

---

[18]   In *Einspahr v. United Fire & Casualty Co.*, a Nebraska appeals court held that the insured was not entitled to any business income or lost profits coverage because such coverage was not purchased by the insured. No. A-99-371, 2000 WL 758654 at *6 (Neb.App. June 13, 2000).  The court specifically noted that "[i]n this case, no form providing coverage for lost business income is attached to the policy … We [the Nebraska appeals court] conclude that the trial court correctly determined that there was no coverage, under the terms of the policy, for lost business income."  *Id.*

862050.1

claim specific to these costs, that "[i]n effect, the insured [Products Unlimited] is attempting to charge the property damage claim for fixed overhead expenses that continued despite the interruption to plant operations. Some of these claimed overhead costs include plant utilities, office expense, telephone expense, real estate taxes, interest expense and shop building and equipment depreciation. These costs would normally be part of a business interruption insurance indemnity; however, Products Unlimited chose not to purchase business interruption insurance for the involved loss location. Their claim improperly characterizes these fixed operating expenses as property replacement costs."[19] (*See,* affidavit of William J. Bradshaw, p. 2, attached herein as Exhibit C).

Neither the Replacement Cost Coverage[20] nor the Extra Expense Coverage expressly provide recovery for these expenses. Therefore, Lexington does not owe Products Unlimited any money for such expenses as a matter of law.[21] Lexington respectfully requests that this Court grant Partial Summary Judgment on this issue as a result.

---

[19] Indeed, business interruption coverage and property insurance are wholly distinct forms of insurance. In *Polytech, Inc. v. Affiliated FM Ins. Co.*, the Eighth Circuit considered whether Missouri's valued policy statutes applied to business interruption damages. 21 F.3d 271, 274 (8th Cir. 1994). In deciding that Missouri's valued policy statutes did *not* apply to business interruption coverage, the court said that "business interruption insurance coverage and personal property insurance coverage are widely considered to be *separate and distinct forms* of insurance coverage." *Id.* at 275. (Emphasis added).

[20] Replacement Cost Coverage does not include all conceivable losses. For example, it does not cover interest on construction loans to perform repairs. *Bergren v. Premier Ins. Co.,* 56 Cal.App.3d 273, 128 Cal.Rptr. 452 (1976); nor does it include the cost of procuring additional insurance. *Tisci d/b/a Brandywine Country Club Estate v. State Farm Fire & Cas. Co.,* 48 Ohio App.3d 155, 548 N.E.2d 978 (1988). *See, also, McCorkle*, *supra*, fn 11: replacement of wooden floor does not include cost of cement floor. Likewise, here, replacement cost coverage of the Property does not include continuing fixed overhead.

[21] COUCH ON INSURANCE 3RD, §178:19: It is generally held that unless the loss of profits is expressly insured against, a policy of fire insurance does not cover a loss of profits which the property insured might have produced. [Citing *Connecticut Fire Ins. Co. v. W.H. Roberts Lumber Co.*, 119 Va. 479, 89 S.E. 945 (1916).] Where a statutory form of fire policy limited recovery to actual value, no recovery could be had for such incidental loss as the loss of profits. [Citing *Kingsley v. Spofford*, 298 Mass. 469, 11 N.E.2d 487 (1937).]

26

862050.1

CONCLUSION

Lexington requests this Honorable Court to find:

1.      That the transfer of a portion of Line #2 from Southeast, an insured location in Kentucky, to Products Unlimited, an insured location in Nebraska, does not constitute replacement and as a result, Products Unlimited cannot recover more than the actual cash value of Line #2.

2       That costs incurred or to be incurred after the expiration of two years from the date of loss are not compensable as replacement cost.

3.      That Lexington has paid plaintiff $1,098,365, the full value for the building in the amount scheduled in the Policy, and as result owes Products Unlimited nothing more for the building under the Policy and the valued policy statute of Nebraska.

4.      Products Unlimited's recovery for extra expenses is limited to what actually constitutes extra expense, as well as the Policy's $25,000 sublimit for extra expense costs.

5.      That Products Unlimited can not recover lost labor costs and overhead costs consisting of payroll taxes, variable fringe benefits, fixed fringe benefits and manufacturing plant operating expenses.

Genuine issues of material fact do not exist and, therefore, the Court may enter Partial Summary Judgment on the above issues.  Insurance is a matter of contract, not sympathy - when terms in an insurance contract are clear, they must be afforded their plain and ordinary meaning. *Welfl v. Northland Ins. Co.*, 192 F.3d 1169, 1172 (8th Cir. 1999).

Lexington respectfully requests Oral Argument pursuant to NECR 7.1(3).

Respectfully submitted,

27

862050.1

/s/ John F. Brennan

JOHN F. BRENNAN

MINDY M. MEDLEY

CLAUSEN MILLER, P.C.

JOHN F. BRENNAN

MINDY M. MEDLEY

CLAUSEN MILLER, P.C.

Firm I.D. No. 90181

Chicago, IL 60603-1098

312.855.1010 (phone)

312.606.7777 (fax)

Attorneys for Lexington Insurance Company


DAVID L. WELCH

GAINES, PANSING & HOGAN, L.L.P.

200 Regency One Building

10050 Regency Circle

Omaha, NE 68114

402.392.3517 (phone)

402.397.4853 (fax)

Attorneys for Lexington Insurance Company

28

862050.1

10-5457-00-6

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

PRODUCTS UNLIMITED, INC., a )
Nebraska corporation )
                      )
                Plaintiff )
                      )       No. 8:03-CV-32
      v. )
                      )       Judge: Thomas D. Thalken
LEXINGTON INSURANCE COMPANY, a )
Delaware corporation )
                Defendant )
                      )

## REQUEST FOR ORAL ARGUMENT

Defendant Lexington Insurance Company requests oral argument on its Motion for

Partial Summary Judgment.

Respectfully submitted,

/s/ John F. Brennan

JOHN F. BRENNAN

MINDY M. MEDLEY

CLAUSEN MILLER, P.C.

JOHN F. BRENNAN

MINDY M. MEDLEY

CLAUSEN MILLER, P.C.

Firm I.D. No. 90181

29

862050.1

Chicago, IL 60603-1098

312.855.1010 (phone)

312.606.7777 (fax)

Attorneys for Lexington Insurance Company


DAVID L. WELCH

GAINES, PANSING & HOGAN, L.L.P.

200 Regency One Building

10050 Regency Circle

Omaha, NE 68114

402.392.3517 (phone)

402.397.4853 (fax)

Attorneys for Lexington Insurance Company

30

862050.1

10-5457-00-6

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| PRODUCTS UNLIMITED, INC., a Nebraska corporation | ) ) ) | |
| Plaintiff, | ) ) | No. 8:03-CV-32 |
| v. | ) ) | |
| LEXINGTON INSURANCE COMPANY, a Delaware corporation, | ) ) ) | Judge: Thomas D. Thalken |
| Defendant. | ) ) ) | |

### AFFIDAVIT REGARDING EXHIBITS IN SUPPORT OF DEFENDANT LEXINGTON INSURANCE COMPANY'S MOTION FOR PARTIAL SUMMARY JUDGMENT

I, John F. Brennan, state under oath, that I have personal knowledge of and can testify to the following:

1.      I am an attorney assigned to represent defendant Lexington Insurance Company in this litigation.

2.      I have reviewed the Exhibits A through O attached to defendant Lexington Insurance Company's Memorandum of Law in Support of Its Motion for Partial Summary Judgment.

3.      Each of those exhibits is a true and correct copy of documents generated by, retrieved or received by Lexington Insurance Company through its agents regarding the

31

862050.1

adjustment and investigation of the plaintiff's claim or during this litigation.

DATED this 5th day of November, 2003.

/s/ John F. Brennan

JOHN F. BRENNAN
CLAUSEN MILLER, P.C.

Subscribed and sworn to before me

this 5th day of November, 2003.

/s/ Sharon Gehrke

Notary Public

JOHN F. BRENNAN

MINDY M. MEDLEY

CLAUSEN MILLER, P.C.
10 South LaSalle Street
Chicago, IL   60603-1098
312.855.1010 (phone)
312.606.7777 (fax)

DAVID L. WELCH
GAINES, PANSING & HOGAN, LLP
200 Regency One Building
10050 Regency Circle
Omaha, NE  68114

402.392.3517 (phone)

32

862050.1

33

402.397.4853 (fax)

862050.1

**INDEX OF EXHIBITS IN SUPPORT OF DEFENDANT LEXINGTON INSURANCE
COMPANY'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

| Exhibit | |
|---------|---|
| A | Replacement Cost Coverage Endorsement |
| B | Ordinance or Law Coverage Endorsement |
| C | Affidavit of William J. Bradshaw |
| D | Invoice of Bonded Fibers Southeast, Inc. |
| E | Excerpt, Deposition of Gary Pospisal |
| F | Excerpt, Deposition of Scott Beier |
| G | Corporate Disclosure Statements dated November 3, 2003 |
| H | Excerpt, Initial Disclosures of Products Unlimited |
| I | Policy's Statement of Values |
| J | Letter to Products Unlimited's Counsel, January 16, 2001 |
| K | Letter to Products Unlimited's Counsel, February 11, 2002 |
| L | Letter from Products Unlimited's Counsel, March 4, 2002 |
| | Letter from Products Unlimited's Counsel, March 18, 2002 |
| | Letter to Products Unlimited's Counsel, March 18, 2002 |
| | Letter to Products Unlimited's Counsel, March 19, 2002 |
| M | Letter to Products Unlimited's Counsel, January 10, 2003 |
| N | Products Unlimited - Sublimits - Notes |
| O | Full Reproduction of Lexington Policy #4015060 |

34

862050.1

35

862050.1